UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRYAN BOWEN; CHANDLER HILL; JENNIFER
HOSKINS; TIM MAGNUSSON; CARL VORDER
BRUEGGE; and WILLIAM WIESSNER,

                                    Plaintiffs,

v.                                                          1:21-CV-0812 (GTS/DJS)

VERITAS TECHNOLOGIES, LLC,

                                    Defendant.
_____

APPERANCES:                               OF COUNSEL:

GLEASON DUNN WALSH & O'SHEA        RONALD G. DUNN, ESQ.
  Counsel for Plaintiffs
40 Beaver Street
Albany, New York 12207

GREENBERG TRAURIG, LLP               NICHOLAS CORSANO, ESQ.
  Counsel for Defendant
One Vanderbilt Avenue
New York, New York 10017

GLENN T. SUDDABY, United States District Court Judge

## DECISION and ORDER

Currently before the court, in this diversity action filed by Bryan Bowen, Chandler Hill,

Jennifer Hoskins, Tim Magnusson, Carl Vorder Bruegge, and William Wiessner (collectively

"Plaintiffs") against Veritas Technologies, LLC ("Defendant"), is Defendant's motion to dismiss

Plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to

Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 22.)  For the reasons set forth below, Defendant's motion is

denied in part and granted in part.

I.      **RELEVANT BACKGROUND**

   **A.**  Plaintiffs' Complaint

In general, Plaintiffs allege that Defendant (for which they each have worked) has unlawfully withheld earned wages owed to them pursuant to terms of a commission plan and/or contract.  (Dkt. No. 1 ["Compl."].)  Based on his alleged unlawful withholding, Plaintiffs assert six related claims under the laws of New York, Maryland, Florida, and Virginia: (1) fraud in the inducement; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) equitable estoppel; (5) unjust enrichment; and (6) violation of New York and Maryland labor laws.  (*Id.*)  More specifically, Plaintiffs' claims are based on the following factual allegations.  (*Id.*)

   The Plan and/or Agreement

In or around May 2019, Plaintiffs agreed to receive commission payments pursuant to Defendant's "Fiscal Year 2020 Incentive Compensation Terms and Conditions" ("the Plan" or "the Agreement") in exchange for selling Defendant's products.  (Compl. ¶ 10.)  Under the Plan, Plaintiffs each had a personalized commission rate applicable to given sales transactions.  (*Id.* ¶ 11.)  If Plaintiffs exceeded their sales quotas, their respective commission payments would be subject to a "5x accelerator," multiplying by five all commissions earned in excess of 100 percent.  (*Id.* ¶ 12.)

At some point prior to implementing the Plan, Defendant gave a "presentation" to Plaintiffs and other sales employees regarding commission quotas.  (Compl. ¶ 16.)  The presentation included a slideshow with a slide titled "FY Global Quota/Coverage Change Summary[.]"  (*Id.*)  The slide stated that there would be no changes to sales quotas in the fourth quarter of the fiscal year 2020.  (*Id.*)  Additionally, the presentation included a slide titled

"Example – 3: FY20 Rep Comp Plan Show Me the Money $$$," which indicated that a sales employee could receive 763.2 percent of their respective quotas and over one million dollars in commissions.  (*Id.* ¶ 18.)  At no point during the presentation did Defendant indicate that it had "discretion to change the sales quotas at any time, including retroactive adjustments, or that [Defendant] could change the quotas in the fourth quarter."  (*Id.* ¶ 19.)

Plaintiff Bryan Bowen

Plaintiff Bryan Bowen ("Mr. Bowen") works for Defendant as a "Public Sector Inside Salesperson" in Florida.  (Compl. ¶¶ 1, 33.)  At some point, Defendant provided Mr. Bowen a commission agreement that contained an "M1 quota" of $570,122.00 and an "M2 quota" of $2,619,088.00.  (*Id.*)  Mr. Bowen and Defendant executed the agreement on May 16, 2019.  (*Id.*)  However, in September 2019, Defendant increased Mr. Bowen's M1 quota to $1,300,000.00.  (*Id.* ¶ 34.)  Mr. Bowen was informed that, if he did not accept the change, he would not receive his M1 or M2 commissions.  (*Id.*)  Mr. Bowen alleges that Defendant withheld the commissions "as leverage to get Mr. Bowen to sign the new compensation plan."  (*Id.*)

At some point during the fiscal year fourth quarter, Defendant verbally informed Mr. Bowen that his M2 quota would be increased by 59 percent to $6,300,000.00.  (Compl. ¶ 35.)  Defendant also informed Mr. Bowen that his M2 quota would be capped at 150 percent of his "on-target-commission goal".  (*Id.*)  The M1 change reduced Mr. Bowen's commission from $344,840.00 to $214,688.00.  (*Id.* ¶ 36.)  The M2 change reduced his commission from $272,026.00 to $209,160.00.  (*Id.*)

On April 27, 2020, Mr. Bowen received an email from Defendant regarding his "overperformance" and a purported need for adjustments.  (Compl. ¶ 38.)  The alleged overperformance indicated that Mr. Bowen "far exceeded his quota," generating more revenue

for Defendant than expected.  (*Id.*)  The email stated that the adjustments were either because of "incorrect account mapping" or "quotas being set to low."  (*Id.*)  The email also confirmed that Mr. Bowen's M2 quota had been capped at 150 percent.  (*Id.*)  Mr. Bowen received no other written notification regarding changes to his compensation.  (*Id.*)

Mr. Bowen claims he is owed approximately $193,018.00 in commissions.  (Compl. ¶ 37.)

Plaintiff Chandler Hill

Plaintiff Chandler Hill ("Mr. Hill") works for Defendant as a "Senior Account Manager" in Virginia.  (Compl. ¶¶ 2, 39.)  Mr. Hill received his commission agreement from Defendant containing an M1 quota of $1,379,330.00, and an M2 quota of $1,976,362.00.  (*Id.* ¶ 39.)  The parties executed the agreement in May 2019.  (*Id.*)  In December 2019, Mr. Hill received notification that his M2 quota would be increased to $2,223,563.00.  (*Id.* ¶ 40.)  Mr. Hill was told that if he did not accept the increase, his earned commissions would be withheld.  (*Id.*)  Mr. Hill accepted the change but informed Jeff Davidson, from Defendant's Sales Operations, that he was doing so under duress.  (*Id.*)

On December 23, 2019, Mr. Davidson contacted Mr. Hill.  (Compl. ¶ 14.)  Mr. Davidson indicated that $102,260.68 of Mr. Hill's commissions due in December would not be paid until January 2020.  (*Id.* ¶ 41.)  In late January 2020, Mr. Davidson again called Mr. Hill, informing him that the overdue commissions would not be paid until late February and "not to worry."  (*Id.* ¶ 42.)

On February 26, 2020, Mr. Hill spoke with Mr. Davidson, and David Cerjan, Mr. Hill's direct supervisor.  (Compl. ¶ 43.)  During the call, Mr. Hill learned that he would not be paid the commissions in light of potential quota adjustments.  (*Id.*)  Thereafter, on March 2, Mr. Hill

received an email from Defendant confirming a quota adjustment.  (*Id.* ¶ 44.)  The email indicated that Mr. Hill's initial quota had been "set incorrectly at the beginning of the year or during the Q4 Renewal re-plan activity."  (*Id.*)

Mr. Hill's M2 quota ultimately increased to $3,700,570.00.  (Compl. ¶ 45).  Mr. Hill received no further communication or reasoning from Defendant.  (*Id.*).  Rather, Mr. Hill learned about the change as it appeared on Defendant's online portal.  (*Id.*).  The change amounted to an 87 percent quota increase in the last month of the fiscal year.  (*Id.*).  Mr. Hill brought the change to Mr. Cerjan's attention in an April 24, 2020, email.  (*Id*. ¶ 46).  Mr. Cerjan acknowledged that the fourth quarter change should not have been made and that he would address the issue.  (*Id.*).  However, the matter was neither addressed nor corrected.  (*Id.*).

Mr. Hill claims that he is owed $134,577.00.  (Compl. ¶ 47.)

Plaintiff Jennifer Hoskins

Plaintiff Jennifer Hoskins ("Ms. Hoskins") worked for Defendant as an "Inside Salesperson" in Florida.  (Compl. ¶¶ 3, 48.)  On May 1, 2019, Ms. Hoskins entered into an agreement with Defendant that contained a $974,726.00 M1 quota and a $2,892,603.00 M2 quota.  (*Id.* ¶ 48.)  On March 2, 2020, Defendant informed Ms. Hoskins that her M2 quota had been changed from $2,892,603.00 to $6,707,712.00—a 132 percent increase.  (*Id.* ¶ 49.)  Ms. Hoskins also received an email indicating that her previous quota had been "set incorrectly at the beginning of the year or during the Q4 Renewal re-plan activity[.]" (*Id.* ¶ 50.)  Ms. Hoskins claims that she "was never provided any opportunity to agree to this plan, it was imposed unilaterally and without notice[.]"  (*Id.*, ¶ 51).  Defendant has informed Ms. Hoskins that she would receive no further compensation for fiscal year 2020.  (*Id.* ¶ 52.)

Ms. Hoskins claims that she is owed $54,966.00 in unpaid commissions.  (*Id.*, ¶ 51).

<u>Plaintiff Tim Magnusson</u>

Plaintiff Tim Magnusson ("Mr. Magnusson") works for Defendant as a "Large Enterprise Account Manager" in New York.  (Compl. ¶¶ 4, 53.)  Mr. Magnusson received a commission sales agreement that included a $1,7515,333.00 M1 quota and a $7,213,607.00 M2 quota.  (*Id.* ¶ 53.)  Mr. Magnusson and Defendant entered into the agreement on or around May 1, 2019.  (*Id.*)  Defendant later increased Mr. Magnusson's M1 quota to $2,532,333.00 and his M2 quota to $7,332,737.00 during the fiscal year fourth quarter.  (*Id.* ¶ 54.)  On or around January 25, 2020, Mr. Magnusson wrote to his supervisors regarding the non-payment of his commissions.  (*Id.* ¶ 56.)  Mr. Magnusson was informed that his January commission would be capped at 100 percent because of a "significant overpay of individuals."  (*Id.*)  Mr. Magnusson wrote again on February 25, 2020, asking whether he would be paid his commissions.  (*Id.* ¶ 57.)  Mr. Magnusson was informed that his annual commission would be capped at 250 percent.  (*Id.*)  Mr. Magnusson was also informed that the change was due to "errors in the setting and deployment" of his M1 and M2 metrics.  (Compl. ¶ 58.)

Mr. Magnusson claims that he is owed $318,473.00 in unpaid commissions under his initial quotas.  (Compl. ¶ 58.)

<u>Plaintiff Carl Vorder Bruegge</u>

Plaintiff Carl Vorder Bruegge ("Mr. Vorder Bruegge") works for Defendant as a "Customer Success Manager" in New York.  (Compl. ¶¶ 5, 60.)  Mr. Vorder Bruegge received a commission sales agreement that included an M1 quota of $1,643,060 and an M2 quota of $3,769,681.  (*Id.* ¶ 60.)  Mr. Vorder Bruegge and Defendant executed the agreement in May 2019.  (*Id.*)  In December 2019, Mr. Vorder Bruegge accepted a change to his compensation plan, increasing his M1 and M2 quotas to $1,784,055.00 and $5,266,618.00, respectively.  (*Id.* ¶

61.)  Mr. Vorder Bruegge claims that this change "was not supported by consideration."  (*Id.*)

In February 2020, Mr. Vorder Bruegge's compensation plan changed again.  (Compl. ¶ 62).  Mr. Vorder Bruegge's M1 quota increased to $2,603,055.00, and his M2 quota increased to $7,107,957.00.  (*Id.*)  Mr. Vorder Bruegge was given no advance notice of this change and he did not accept it prior to implementation.  (*Id.* ¶¶ 62, 64.)

On March 9, 2020, Mr. Vorder Bruegge contacted his supervisors regarding the changes in quotas and he was informed that the changes were a result of "errors in the setting and deployment" of his M1 and M2 metrics.  (Compl. ¶¶ 63, 66.)

Mr. Vorder Bruegge claims that he is owed $374,557.00 in commission under the initial quotas.  (Compl. ¶ 65.)

<u>Plaintiff William Wiessner</u>

Plaintiff William Wiessner ("Mr. Wiessner") works for Defendant as an "Account Manager Five" in Maryland.  (Compl. ¶¶ 6, 68.)  Mr. Wiessner received a commission sales agreement that included an M2 quota of $4,937,743.88.  (*Id.* ¶ 68.)  Defendant and Mr. Wiessner executed the agreement on May 26, 2019.  (*Id.*)  During fiscal year 2020, Mr. Wiessner made sales totaling $8,061,111.35 in "M2 business" for Defendant.  (*Id.* ¶ 69.)  According to Defendant's online portal as of April 24, 2020, Mr. Wiessner had earned $259,802.38 in M1 and M2 commissions.  (*Id.*)

On April 27, 2020, after the fiscal year fourth quarter ended, Mr. Wiessner received an email from Defendant regarding his "overperformance" and the need for adjustments.  (Compl. ¶ 73.)  Defendant stated that the adjustments were either because of "incorrect account mapping" or "quotas being set to low." (*Id.*)   Defendant also informed Mr. Wiessner that his M2 commissions would be capped at 110 percent.  (*Id.* ¶ 70.)

Mr. Wiessner claims that Defendant is withholding $131,822.60, which includes M2 commissions "along with the service and multi-year bonuses that were not paid."  (*Id.* ¶ 71.)

**B.**   The Plan's Relevant Terms

Affixed to the Complaint is a copy of the Plan.  (Dkt. No. 1-2.)  In pertinent part, the Plan states as follows:

> **To the extent permitted by applicable local laws**, [Defendant] has complete authority and sole discretion to determine the appropriate resolution of any alleged or actual inconsistencies, issues (administrative or otherwise) or ambiguities arising under the Plan.  Furthermore, [Defendant] reserves the right in its sole discretion to modify all aspect of the Plan, including but not limited to these FY20 Incentive Compensation General Terms and Conditions, Individualized Compensation Plans (as well as specific Plan Elements), individual Goal Sheets, Plan assignments, territories and accounts and territory/account assignments, Sales quotas the Sales Compensation Policy and FY20 Sales Compensation Governance Approval Matrix (the "Approval Matrix").  No modification will be effective unless in writing and approved with the published FY20 Sales Compensation Governance Approval Matrix and/or the terms of this Plan.  The approval process need not be complete before a modification becomes effective – approval can be given retroactively.

(*Id.*, pp. 9-10.)  Additionally, relative to quotas and adjustments, the Plan states as follows:

> **Quotas** – may be increased or decreased prospectively in situations, including but not limited to where quotas were not set to reflect sales not anticipated or where sales were not reasonably certain at the time Sales Quotas were established or where errors are made in quota setting. Retroactive changes to Sales Quotas will be reviewed on a case by case basis and determinations will be made subject to applicable local law. [Defendant] reserves the right to adjust Quotas at any time (prospectively or retroactively) at [Defendant's] sole discretion with or without prior written notice, subject to applicable local law.  Such changes may be in consideration of, among other things, changes in market conditions, in response to currency movements and in response to a Plan Participant's request for quota reduction.  An adjustment to the exchange rate, if deemed appropriate, will result in a respective adjustment of the quota.  In the event the Participant requests and obtains approval for a quota reduction, and subsequently overachieves by more than 130% of the revised quota and the quota reduction is not a result of an error in quota setting, the Participant may be subject to a revision of Plan back to original quota assigned.  This stipulation is to be communicated to the

> Participant/s when the reduction is communicated.  Changes to quotas will require review and approval by Sales Management (refer to FY20 Sales Compensation Governance Approval Matrix), EVP of WW Field Operations and/or his/her designee(s) and/or EVP Customer Success.

(*Id.*, p. 10.)

The Plan also states that, "[w]hen a Plan Participant's commission earnings exceed 250%," Defendant "will review the Plan Participant's attainment to determine whether a windfall has occurred[.]"1  (Dkt. No. 1-2, p. 11.)   Furthermore, the Plan states that, "[i]n the case of a windfall, a Plan Participant may earn a lower commission than the amount provided for in the Plan Participant's Plan Acknowledgement Form, subject to applicable local law."  (*Id.*)  With respect to providing notice, the Plan states that Defendant "will attempt to inform a Plan Participant of modifications prior to carrying them out but cannot guarantee that it will do so in every instance, subject to applicable local law."  (*Id.*)

Moreover, the Plan states that "[s]ignature on the Individualized Compensation Plan, either in writing or electronically by clicking acceptance, and/or acceptance of any payments under the Plan, and/or performance of any work in a position covered by the Plan, constitutes acceptance of the Plan and agreement by Plan Participant to its terms, subject to applicable local law."2  (Dkt. No. 1-2, p. 8.)  The Plan also contains a confidentiality provision that states "[a]ny disclosure without prior written consent shall constitute a breach of this Plan as well as a breach of the Confidential and Intellectual Property Agreement to which the Plan Participant is bound."  (*Id.*, p. 13.)

---

1      "A 'windfall' is defined as a situation where a Participant's earnings far exceed the Participant's annual On-Target Commission (OTC) due to unanticipated large transaction(s) not included in quota setting, or a large transaction(s) during a plan year which requires unusual or significant management involvement."  (Dkt. No. 1-2, p. 11.)

2      Plaintiffs have not submitted any "Individualized Compensation Plans" reflecting the specific quotas and accelerators alleged in the Complaint.

### C.  Parties' Briefing

#### 1.  Defendant's Memorandum of Law

Defendant seeks dismissal of the Complaint in its entirety for failure to state a claim.  (Dkt.

No. 25.)  As to Plaintiffs' contract claims, Defendant argues that the Plan is not a binding

contract and that Plaintiffs had no contractual right to the commissions at issue.  (*Id.*, pp. 17-19.)

In any event, Defendant argues that the Plan's terms and conditions authorize prospective and

retroactive quota modifications and incentive pay withholdings, and that Plaintiffs should have

anticipated the exercise of such discretion.  (*Id.*, pp. 19-20.)  Defendant argues that the implied

covenant of good faith and fair dealing claims are duplicative of the breach of contract claims

and that they otherwise fail under the relevant state laws.  (*Id.*, pp. 21-24).

As to Plaintiffs' fraud in the inducement claims, Defendant argues that Plaintiffs had notice

that the alleged oral representations were untrue insofar as the Plan's written terms expressly

contradict same.  (Dkt. No. 25, pp. 25-31.)  Notwithstanding that fact, Defendant argues that

such claims fail because the Complaint alleges only an "insincere promise."  (*Id.*, pp. 31-33.)

Moreover, Defendant argues that Plaintiff's equitable estoppel claims are not recognized as

independent causes of action in any jurisdiction.  (*Id.*, pp. 33-34.)  Defendant argues that the

unjust enrichment claims fail because the allegations do not plead "inequitable" circumstances

and that Plaintiffs derived a substantial benefit.  (*Id.*, pp. 35-37.)  Regarding the statutory claims,

Defendant argues that the claims fail because there is no enforceable contract right to alleged

wages and that the wages were not earned.  (*Id.*, pp. 40-43.)  Finally, Defendant argues that some

of the jurisdictions invoked by Plaintiffs do not recognize all of the causes of action asserted.

(*See generally id.*)

#### 2.  Plaintiff's Opposition Memorandum of Law

Generally, Plaintiffs argue that the Plan is a binding contract as reflected by, *inter alia*, its usage of terms such as "acceptance," "agreement," and "breach."  (Dkt. No. 30, pp. 24-26.) Plaintiffs argue that "[t]he presence of a discretionary provision in a contract does not render it illusory if there is evidence the parties intended to be bound" and that, in any event, Defendant's discretionary rights are "not limitless and cannot be applied in an arbitrary, unreasonable, and oppressive manner[.]"  (*Id.*, pp. 8-9, 26, 28-30.)  Plaintiffs argue that, even if acting within its discretion, Defendant "acted dishonestly and in bad faith by sending out form letters with multiple pro-forma reason for the quota increases, failing to tell the Plaintiffs the actual reason for their adjustment[.]"  (*Id.*, p. 32.)  Furthermore, Plaintiffs argue that Defendant committed fraud by inducing them with false oral and written representations regarding the Plan's terms. (*Id.*, pp. 33-35.)  Plaintiffs argue that the unjust enrichment claims are adequately plead in the alternative considering that Defendant disputes the existence of a contract, and that Defendant derived a substantial benefit at Plaintiffs' expense.  (*Id.*, pp. 35-39.)  Finally, Plaintiffs argue that the statutory claims under New York and Maryland law are adequately plead because the commissions at issue constitute unpaid wages.  (*Id.*, pp. 39-41.)

> **3.** Defendant's Reply Memorandum of Law

In reply, Defendant argues that Plaintiffs are trying to "bind Veritas to a 'contract' that does not exist."  (Dkt. No. 36, p. 7.)  Defendant argues that "Plaintiffs cannot argue the Plan is an enforceable contract, on the one hand, and, on the other, argue Veritas breached its terms by exercising rights the Plan reserves to it."  (*Id.*)  Defendant argues that the Plan "(1) states it is not an employment contract; (2) reserves the unfettered right to amend; and (3) tells Plan Participants that participating in the Plan only makes them eligible for potential commission payments subject to [Defendant's] absolute discretion."  (*Id.*, p. 11.)  Defendant argues that

"Plaintiffs admit: (1) they had the opportunity to read the Plan before accepting it; and (2) a plan reading shows [Defendant] possessed the discretion to do what it did." (*Id.*, p. 16.)  Furthermore, Defendant argues that Plaintiffs' failure to address its equitable estoppel arguments amount to a concession.  (*Id.*, p. 8 n. 1.)

## I.     GOVERNING LEGAL STANDARD

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim.  *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn. 15–16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate.  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal."  *Jackson*, 549 F. Supp. 2d at 212, n. 20 (citing Supreme Court cases).  On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of

what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 Supp. 2d at 212,

n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of

"enable[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper

decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n. 18 (citing Supreme

Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n. 32 (N.D.N.Y. 2009) (Suddaby,

J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed,

the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b]

at 12–61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions

exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*,

629 F. Supp. 2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft*

*v. Iqbal*, 556 U.S. 662, 677–82 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an

appellate decision holding that a complaint had stated an actionable antitrust claim under 15

U.S.C. § 1. 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous statement by the

Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed

for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 556-51.

Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair

notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555-70. The Court

explained that, while this does not mean that a pleading need "set out in detail the facts upon

which [the claim is based]," it does mean that the pleading must contain at least "some factual

allegation[s]." *Id.* at 555 n. 3. More specifically, the "[f]actual allegations must be enough to

raise a right to relief above the speculative level [to plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556.) "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]–that the pleader is entitled to relief." *Id.*, at 679 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Similarly, a pleading that only "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

"To be sure, litigants have substantial leeway under Rule 8(e) to plead alternative, and even inconsistent, claims." *Kwan v. Schlein*, 246 F.R.D. 447, 451 (S.D.N.Y. 2007) (citing *Henry*

*v. Daytop Village, Inc.*, 42 F.3d 89, 95-96 (2d Cir. 1994)). "However, each alternative theory must itself be sufficient to state a claim, and '[f]actual allegations must be enough to raise a right to relief above the speculative leave.'" *Kwan,* 246 F.R.D. at 451 (quoting *Twombly*, 550 U.S. at 545).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.3

---

3       *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); L-*7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. . . .  Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint. . . . However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co*., 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the

## II.     ANALYSIS

### A. Plaintiffs' Claim of Fraud in the Inducement

Plaintiffs' fraud in the inducement claim alleges that they agreed to work for Defendant based on its false representations that Plaintiffs could earn up to 762.3% of his or her quota, and that the quota would not be changed in the fourth quarter.  (Dkt. No. 1, ¶¶ 77-84; Dkt. No. 30, pp. 32-35.).

"To state a claim for fraud in the inducement, the party must allege: (i) a material representation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages."  *Johnson v. Nexttel Commu'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citing *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478 (2007)).  Additionally, to state a claim for fraud in the inducement related to a contract under New York law, the plaintiff "must (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."4  *Lorterdan Properties at Ramapo, LLC v. Watchtower Bible and Tract Society of N.Y., Inc.*, 11-CV-3656, 2012 WL 2873648, at *17 (S.D.N.Y. Jul. 10, 2012) (internal citations and quotation marks omitted).

Here, Defendant argues that Plaintiffs' fraud in the inducement claim fails because they "had notice that the alleged oral representations were not true."  (Dkt. No. 25, p. 25.)  Defendant

---

complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

4       The Court finds that each jurisdiction cited in the Complaint requires a plaintiff to allege substantially similar elements to state a cause of action for fraud in the inducement.  *See, e.g., HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238 (Fla. 1996); *Gross v. Sussex Inc.*, 332 Md. 247 (Md. 1993); *Abi-Najm v. Concord Condominium, LLC*, 280 Va. 350 (Va. 2010).  Accordingly, the claims are discussed herein together without distinction.

also argues that "a party to a contract cannot reasonably rely on oral statements that are contradicted by the plain terms of the final agreement." (*Id.*, p. 28 [citations and internal quotations omitted].) Defendant argues that the alleged slideshow presentation regarding fourth-quarter sales quotas and the statements that "employees could earn 793.2% of their quota and over one million dollars in commission" would have "excite[d] the suspicions of a reasonable person." (*Id.*, p. 26 [citation and internal quotations omitted].) Furthermore, Defendant argues that the language regarding its absolute discretion to change the Plan "was not hidden." (*Id.*) Defendant argues that "the Plan states at least seven times across six pages that [Defendant] can change the Plan at any time, with or without notice, in its sole discretion." (*Id.*) Notwithstanding this fact, Defendant argues that the Complaint alleges merely an "insincere promise" not rising to the level of fraud.

Plaintiffs do not dispute that they "had the opportunity to read the Plan prior to accepting it and that a reading of the Plan shows the Defendant has discretion to modify the quotas." (Dkt. No. 30, p. 33.) Rather, they argue that "it is a question of fact whether a reasonable reading of the Plan would have alerted the Plaintiff of what was to come, i.e. substantially raising quotas or capping commissions without explanation and likely after such commissions had been earned." (*Id.*) Plaintiffs argue that reading the Plan would not have "disprove[d] Defendant's wildly inaccurate statements in the slideshow, [and] would not have uncovered that the Defendant intended to abuse [its] discretion[.]" (*Id.*)

The Court finds that Plaintiffs have adequately stated a claim for fraudulent inducement under New York, Florida Virginia, and Maryland for the reasons articulated by Plaintiffs. In a nutshell, Plaintiffs have alleged facts plausibly suggesting that Defendants made material representations about potential quotas that Defendant knew were false, that Plaintiffs reasonably

relied on those representations in entering into the Agreement, and that Plaintiffs were injured when they did not receive commissions at the level promised in the quotas.

### B. Plaintiffs' Claim of Breach of Contract

Plaintiffs claim that the Plan constituted a binding contract and that Defendant breached same by substantially modifying their quotas and/or commissions without notice in the fourth quarter of the fiscal year, resulting in unpaid earned commissions.  (Compl. ¶¶ 85-90; Dkt. No. 30, pp. 24-30.)

"Under New York law, to survive a motion to dismiss a breach-of-contract claim, [the c]omplaint must allege facts that plausibly suggest '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages.'"[5]  *Lamoureux v. Truscto Bank*, 592 F. Supp. 3d 14, 27 (N.D.N.Y. 2022) (Suddaby, C.J.) (quoting *Habitzreuther v. Cornell Univ.*, 14-CV-1229, 2015 WL 5023719, at *5 (N.D.N.Y. Aug. 2015 [Sharpe, J.]).

Defendant argues that "the express terms of the Plan preclude Plaintiffs from satisfying [breach of contract] elements."  (Dkt. No. 25, p. 17.)  Defendant argues that, because the terms allow it to "modify the Plan proactively or retroactively in its sole discretion[,] . . . no binding contract can exist because there is no mutuality of assent[.]"  (*Id.*)  Defendant acknowledges that the Plan requires employees to "accept" its terms, but contends that this is only to "indicate their desire to be eligible for commissions[.]"  (Dkt. No. 36, p. 10.)  To the extent the Plan uses the term "breach," Defendant argues that it is limited only to the Plan's confidentiality agreement, and thus separate from the commission terms.  (*Id.*)  Defendant argues that, even assuming a contract existed, no breach occurred because the Plan's terms expressly authorize discretionary

---

[5]    The parties' argument appear to be equally applicable to the jurisdictions of New York, Florida, Maryland, and Virginia.  Based on the Court's limited review, to state a claim for breach of contract, each jurisdiction requires showing the well-known elements of duty, breach, and harm.  *See, e.g., In re Standard Jury Instructions—Contract and Business Cases*, 116 So. 3d 284 (Fla. 2013); *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638 (Md. 2010); *Filak v. George*, 267 Va. 612 (Va. 2004).

quota modifications.  (Dkt. No. 25, p. 20.)

Plaintiffs argue that "the Plan's express terms identify it as a contract," which includes language such as "agreement," "acceptance," and "breach."  (Dkt. No. 30, pp. 8, 24-26.) Plaintiffs argue that Defendant's "broad discretion" under the Plan does not render the contract "illusory" as the parties intended to be bound.  (*Id.*, p. 26.)  Moreover, Plaintiffs argue that Defendant's discretion to modify commissions "is not limitless and cannot be applied in an arbitrary, unreasonable, or oppressive manner."  (*Id.*, pp. 9, 28-30.)  By way of example, Plaintiffs argue that Defendant's form letter explanation stating that "the quota change was being made because of 'incorrect account mapping' **or** 'quotas being set too low,'" left Plaintiffs' without a specific reason for their adjustments.  (*Id.*)  In any event, Plaintiffs argue that the adjustments amount to "oppressive commission gouging" considering such drastic quota reductions.  (*Id.*)

After carefully reviewing the parties' arguments, the Court finds that Plaintiffs have stated a plausible claim for breach of contract, for the reasons articulated by Plaintiffs. Assuming Plaintiffs' allegations are true, Plaintiffs viewed the Plan as a contract, agreed to it, adequately performed their obligations, and Defendant breached the contract by not paying Plaintiffs commissions at the agreed upon level, which caused Plaintiffs damages.  Although Defendant argues that it had discretion to modify quotas under the Plan—thus negating any breach—at this stage in the proceedings the Court must credit Plaintiffs' allegations that Defendant's modifications exceeded the parties' agreed understanding.

## C.  Plaintiffs' Claim of Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs claim that Defendant breached the implied covenant of good faith and fair dealing by abruptly modifying their quotas in the last quarter without advance notice and without

explanation.  (Compl. ¶¶ 91-94; Dkt. No. 30, pp. 30-32.)

       1.     <u>New York, Florida, and Virginia Jurisdictions</u>

In New York, the duty of good faith and fair dealing "is implied in every contract, to the effect that neither party 'shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *CCR Int'l, Inc. v. Elias Grop., LLC*, 15-CV-6563, 2021 WL 1253892, at *4 (S.D.N.Y. Apr. 5, 2021) (citing *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006)).  "The implied covenant does not include any term inconsistent with the terms of the contractual relationship, or 'create duties which are not fairly inferable from the express terms of that contract.'"  *CCR Int'l, Inc.*, 2021 WL 1253892, at *4 (quoting *Interallianz Bank AG v. Nycal Corp.*, 93-CV-5024, 1994 WL 1777745, at *8 (S.D.N.Y. May 6, 1994)).  "[W]hen the contract involves the exercise of discretion," the implied covenant includes "a promise 'not to act arbitrarily or irrationally in exercising that discretion.'"  *Id.* (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)).  "The elements of a claim of breach of the implied covenant are similar to those for a breach of duty of care, in that it requires the existence of a duty, breach of that duty, causation, and damages."6  *Id.* (citing *Washington v. Kellwood Co.*, 05-CV-10034, 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009)).

Importantly, "New York law does not treat a breach of the covenant of good faith and fair dealing claim as one that is *separate* from a breach of contract claim where the claims are based on the same facts."  *Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 73 (2d Cir. 2013) (summary order) (citing *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80–81 (2d Cir. 2002)).  As a result, where an implied covenant claim is duplicative of a breach of contract

---

6     After carefully reviewing the record and the parties' contentions, the Court finds that a claim for breach of the implied covenant of good faith and fair dealing under Florida and Virginia law is substantially similar if not the same as New York.  *See, e.g., In re Standard Jury Instructions—Contract and Business Cases*, 116 So. 3d 284 (Fla. 2013); *Ward's Equipment, Inc. v. New Holland North America, Inc.*, 254 Va. 379 (Va. 1997).

claim, the former should be dismissed. *CCR International*, 2021 WL 1253892, at *4 (citing

*Deutsche Bank Nat'l Tr. Co. v. Quicken Loan, Inc.*, 810 F.3d 861, 869 (2d Cir. 2015)).  "Claims

are duplicative when both 'arise from the same facts and seek the identical damages for each

alleged breach.'"  *Deutsche Bank*, 810 F.3d at 869 (quoting *Amcan Holdings, Inc. v. Canadian

*Imperial Bank of Com.*, 70 A.D.3d 423, 426 (N.Y. App. Div., 1st Dept. 2010)).

Defendant argues that the Plan is not a contract and thus there can be no plausible

implied covenant claim.  (Dkt. No. 25, p. 21.)  Defendant also argues that the claim is

duplicative of Plaintiffs' breach of contract claim.  (*Id.*, pp. 22-23.)  In any event, Defendant

argues that the claim should be dismissed because "Plaintiffs should have anticipated

[Defendant's] exercise of discretion."  (*Id.*, p. 23.)  Defendant argues that the Plan's express

terms permit retroactive and prospective modifications, and that Plaintiffs would not have been

eligible for compensation had they not accepted such terms.  (*Id.*, p. 24.)  Defendant argues that

Plaintiffs could not have legitimately maintained a reasonable expectation to the contrary.  (*Id.*)

Plaintiffs argue that "[w]hether the implied covenant of good faith and fair dealing is an

independent cause of action as in some of the relevant jurisdictions, or is baked into the breach

of contract claim as in others, each of the jurisdictions here recognized the covenant[.]"  (Dkt.

No. 30, p. 9.)  Plaintiffs argue that Defendant violated the implied covenant "by making

significant quota adjustments" at the end of the fiscal year.  (*Id.*, p. 31.)  Plaintiffs argue further

that "Defendant acted dishonestly and in bad faith by sending out form letters with multiple pro-

forma reason for the quota increases, failing to tell the Plaintiffs the actual reason for their

adjustment."  (*Id.*, p. 32.)  Plaintiffs argue that "[n]o reasonable person would anticipate such

drastic changes would be made without explanation."  (*Id.*)

Herein, the Court finds that Plaintiffs' claims of breach of the implied covenant of good

faith and fair dealing are sufficiently distinct from their claims of breach of contract to survive Defendant's motion.  Assuming Plaintiff's allegations are true, although the Plan afforded Defendant a contractual right to unilaterally modify sales quotas and/or commissions without advance notice, there was an implied duty to exercise that right in a reasonable fashion. Plaintiffs allege that Defendant's modifications were simply too drastic, abrupt, and inexplicable—in addition to the fact that they were made in the final weeks of the last quarter, and nearly a full calendar year into the Plan's term.  Said differently, it is plausible that Defendant breached the duty of good faith and fair dealing without actually breaching the alleged contract.

Accordingly, Plaintiffs have stated a valid claim for breach of implied covenant of good faith and fair dealing claims under the laws of New York, Florida, and Virginia.

2.    Maryland Jurisdiction

"[N]o independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing."  *Mount Vernon v. Branch*, 170 Md. App. 457, 471-72 (2006), *cert. denied*, 397 Md. 397 (Md. 2007).  Rather, the duty "is better viewed as an element of another cause of action at law, *e.g.*, breach of contract, than as a stand-alone cause of action for money damages[.]"  *Mount Vernon*, 170 Md. App. at 471-72.

Defendant argues that Maryland does not recognize claims for breach of the implied covenant of good faith and fair dealing.  (Dkt. No. 25, p. 21.)  Plaintiffs agrees but notes that Maryland "does apply the covenant to support another alleged cause of action such as breach of contract."  (Dkt. No. 30, p. 30 [citations omitted].)  Consequently, Mr. Wiessner's separate claim for breach of the implied covenant of good faith and fair dealing under Maryland law must be dismissed.

### D. Plaintiffs' Claim of Equitable Estoppel

Plaintiffs' claim of equitable estoppel alleges that "Defendant made a presentation to the Plaintiffs that stated no changes to sales quotas would be made in the fourth quarter and that, under the Agreement, the Plaintiffs could make as much as 763.2% of their quota." (Compl. ¶ 96.)  Plaintiffs allege that they "relied" on Defendant's statement to their "detriment" causing them harm.  (*Id.* ¶ 99.)

"[E]quitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit."  *Dillman v. Combustion Engineering, Inc.*, 784 F.2d 57, 60-61 (2d Cir. 1986) (quoting *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49-50 (2d Cir. 1985)).  "Typically, the doctrine is invoked in cases in which an employer has made misrepresentations concerning the statute of limitations or 'lulled the plaintiff into believing that it was not necessary for him to commence litigation.'"  *Tard v. Brookhaven Nat'l Lab.*, 407 F Supp. 2d 404, 416 (E.D.N.Y. 2006) (quoting *Cerbone*, 768 F. 2d at 50.  "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment."  *Tard*, 407 F Supp. 2d at 416 (internal quotation marks and citation omitted).

Defendant argues that equitable estoppel is not a recognized cause of action.  (Dkt. No. 25, p. 33.)  For instance, Defendant argues that in New York equitable estoppel is merely an equitable bar to the assertion of the statute of limitations affirmative defense.  (*Id.*, p. 34.)  Additionally, Defendant argues in its reply brief that Plaintiff has failed to address its argument and has effectively conceded the argument.  (Dkt. No. 36, p. 8, n. 1.)

The Court agrees with Defendant's position to the extent that equitable estoppel does not

appear to be recognized an independent cause of action in any relevant jurisdiction; and the

Court agrees that Plaintiffs' failure to address the matter in their brief amounts to an effective

concession to Defendant's argument.  Accordingly, all of the claims for equitable estoppel in

Count IV of the Complaint as asserted by each Plaintiff in this case must be dismissed.

### E.  Plaintiffs' Claim of Unjust Enrichment

Plaintiffs claim that Defendant has been "unjustly enriched" by withholding commission

payments at the expense of Plaintiffs in violation of "principles of equity and good conscience."

(Compl. ¶¶ 100-03; Dkt. No. 30, pp. 35-39.)  Plaintiffs assert this claim in the alternative relative

to their breach of contract claim.  (*Id.*)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1)

that the defendant benefited; 2) at the plaintiff's expense; and 3) that 'equity and good

conscience' require restitution."[7] *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting

*Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)).  "The 'essence' of such a claim

'is that one party has received money or a benefit at the expense of another.'"  *Kaye*, 202 F.3d at

616 (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905 (N.Y. App. Div., 4th

Dept. 1999)).

Defendant argues that Plaintiffs have failed "to plead unjust enrichment in the alternative

to their breach of contract claim[.]"  (Dkt. No. 25, p. 35.)  Defendant argues that "Plaintiffs

incorporate the same facts underlying their breach of contract claim into their unjust enrichment

claim" and "merely recast their breach of contract claim as one sounding in equity[.]"  (*Id.*)

---

[7]     The Court notes that the elements for unjust enrichment in Florida, Maryland, and Virginia appear to be substantially similar to what New York requires with respect to the specific issues raised by the parties.  *See, e.g., Rosado v. Barry Univ. Inc.*, 499 F. Supp. 3d 1152 (S.D. Fla. 2020); *Hill v. Cross Country Settlements, LLC*, 402 Md. 281 (Md. 2007); *James G. Davis Construction Corporation v. FTJ, Inc.*, 298 Va. 582 (Va. 2020).  Accordingly, the Court will discuss the claim together without distinction.

Additionally, Defendant argues that "[u]just enrichment is a quasi-contractual claim imposed by law '**in the absence of any agreement**[,]'" and that, "because the Plan exists, Plaintiffs cannot pursue a claim for unjust enrichment under New York law." (*Id.*) (emphasis in original)

Plaintiffs argue that the unjust enrichment claims are adequately pled in the alternative relative to their breach of contact claim.  (Dkt. No. 30, p. 35.)  Plaintiffs argue that the claims survive "because (1) the Defendant is claiming there is not contract [sic], (2) the Plaintiffs conferred substantial benefits onto the Defendants in the form of sales contracts, (3) the Defendant knowingly accepted the sales contracts, and (4) there is a factual dispute as to whether it was 'just' for the Defendants to drastically reduce the commissions paid for those sales contracts without explanation."  (*Id.*, p. 37.)

Herein, the Court finds that Plaintiffs have adequately alleged the essential elements of an unjust enrichment claim for the reasons set forth in Plaintiffs' memorandum of law—namely, that Plaintiffs sold products to Defendant's benefit, that Plaintiffs were not fairly compensated, and that they should be awarded restitution for their services based on equity and good conscience.  (Dkt. No. 30, pp. 35-39.)  Although the Complaint alleges the existence of a contract based on the same services, the Court will permit Plaintiffs' claims to the extent they are pled in the alternative.  Accordingly, Plaintiffs have stated valid unjust enrichment claims under the laws of New York, Maryland, Florida, and Virginia.

### F.  Plaintiff's Statutory Claims

Plaintiffs Magnusson and Vorder Bruegge bring claims under New York's labor law, alleging that Defendant failed to pay them earned commissions.  (Compl. ¶¶ 104-108.)  Plaintiff Wiessner brings similar claims under Maryland's labor law.  (*Id*. ¶¶ 109-113.)

1.  New York–Statutory Claims

Pursuant to N.Y. Lab. L. § 198, an employee may bring an action against an employer for unpaid wages.8  Furthermore, N.Y. Lab. L. §§ 191 et seq., sets forth specific provisions pertaining to the payment of earned sales commissions.9   The relevant provisions state that "[a] commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment[.]"  N.Y. Lab. L. § 191(1)(c).  An "'[e]arned commission' means a commission due for services or merchandise which is due according to the terms of an applicable contract or, when there is no applicable contractual provision, a commission due for merchandise which has actually been delivered to, accepted by, and paid for by the customer[.]"  N.Y. Lab. L. § 191-a(b).

Defendant argues that Plaintiffs "cannot assert a statutory claim for wages under the Labor law" because they "ha[ve] no enforceable contract right to those wages."  (Dkt. No. 25, p. 40 [internal quotation marks and citations omitted].)  Moreover, Defendant argues that Plaintiffs have no right to such compensation because "[i]n New York, the terms of an employer's bonus plan govern an employee's entitlement to payment under that plan," and the Plan gives Defendant the "right to revise sales quotas prospectively or retroactively."  (*Id.*, pp. 40-41.)   In opposition, Plaintiffs argue that they are entitled to earned commissions pursuant to § 191 "because the Plan is a contract." (Dkt. No. 30, p. 39.)

The Court finds that Plaintiffs Magnusson and Vorder Bruegge have adequately stated a claim under New York's labor law, for the reasons articulated by Plaintiffs.  (Dkt. No.

---

8      "'Wages' means the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. Lab. L. § 190(1).

9      Notably, N.Y. Lab. § 191(1)(c) states as follows: "[t]he agreed terms of employment shall be reduced to writing, signed by both the employer and the commission salesperson[.]"

36, pp. 39-40.)  Assuming Plaintiffs' allegations are true, they earned commissions while

employed by Defendant as salespersons, which have not been paid, in violation of § 191, and

that they are owed unpaid wages, as set forth by Plaintiffs in their memorandum of law.  To the

extent Defendant argues that the alleged monies owed are discretionary incentive "bonuses," the

Court must credit Plaintiffs' interpretation of the Agreement at this point in the proceeding.

2.   Maryland–Statutory Claims

Like New York, Maryland law grants employees a private right of action to pursue unpaid

wage claims.  Pursuant to Md. Code, Lab. & Empl. § 3-507.2, an employer must pay wages

"after 2 weeks have elapsed from the date on which the employer is required to have paid the

wages[.]"  Also similar to New York law, Maryland includes "a commission" within its statutory

definition of "wage."  Md. Lab. & Empl. § 3-501(c)(2)(ii).

Defendant argues that the Maryland statutory claim fails because there is no contractual right

to enforce as to the unpaid commissions.  (Dkt. No. 25, p. 42.)  Defendant argues that the "right

to compensation vests when the employee does everything required to earn the wages[,]" and

that, because Defendant had absolute discretion to determine when the commissions were

earned, there can be no recovery.  (*Id.*, pp. 42-43.)  In other words, Defendant argues that the

alleged commissions were unearned.

Plaintiffs argue that, while an "employer can impose 'reasonable conditions' upon payment,"

Defendant does not have "absolute authority" to determine when a commission is earned

because the Plan expressly provides otherwise.  (Dkt. No. 30, p. 41.)  More specifically,

Plaintiffs argue that "the commission is earned 'when the Company receives full payment from

the customer" according to the Plan's terms.  (*Id.*)

The Court finds that Plaintiff Wiessner has stated a valid claim under Maryland Labor Law

based on his allegations that Defendant was required to pay wages earned in the fourth quarter fiscal year (in the form of commissions Plaintiffs earned for selling Defendant's products) and that, to date, the wages remain unpaid, in violation of § 3-507.2.

**ACCORDINGLY**, it is hereby

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 22) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part**; and it is further

**ORDERED** that Plaintiffs' claims for equitable estoppel as asserted in Count IV (Dkt. No. 1, ¶¶ 95-99) are **<u>DISMISSED</u>**; and it is further

**ORDERED** that Plaintiff William Wiessner's claim for breach of the duty of good faith and fair dealing under Maryland law is **<u>DISMISSED</u>**; and it is further

**ORDERED** that Defendant's motion is **otherwise <u>DENIED</u>;** and it is further

**ORDERED** that Defendant is directed to interpose an Answer within **TWENTY-ONE (21) DAYS** from the date of this Decision and Order.

Dated:  February 16, 2023
      Syracuse, New York

Glenn T. Suddaby
U.S. District Judge